UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

**UNITED STATES OF AMERICA**,

Plaintiff,

vs.

**CURTIS EUGENE ELLISON,**

Defendant.

**2:23-CR-20143-TBG-JJCG**

**OPINION AND ORDER
DENYING MOTION TO
DISMISS (ECF NO. 36) AND
DENYING MOTIONS TO
SUPPRESS EVIDENCE
(ECF NOS. 33, 34, & 35)**

---

A tip from a confidential informant led detectives from the County of Macomb Enforcement Team (COMET) to begin investigating Curtis Eugene Ellison for drug-dealing. Over the course of their investigation, they obtained a warrant to place a GPS tracking device on his car and, later, two more warrants to search his residence. During a search of his home, they seized 3 kilograms of fentanyl, 856 grams of cocaine, 25 MDMA tablets, 7 firearms, and approximately $190,000 in currency.

As a result of these seizures, Ellison has been charged with possessing fentanyl with intent to distribute, 21 U.S.C. § 841(a)(1), possessing cocaine with intent to distribute, 21 U.S.C. § 841(a)(1), possessing a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A), possessing a firearm as a felon, 18 U.S.C. § 922(g)(1), and maintaining a drug premises, 21 U.S.C. § 856(a)(1).

1

Ellison now seeks dismissal of the § 922(g)(1) charge, arguing that dismissal is mandated by the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). ECF No. 36. He has also filed motions to suppress evidence, challenging the adequacy of the warrants and requesting a *Franks* hearing. ECF Nos. 33, 34 & 35.

The Court held a hearing on Ellison's motions on May 3, 2024. At the hearing, the Court allowed both Ellison and the government to supplement the record with respect to Ellison's request for a *Franks* hearing. Having received the last of the parties' supplemental submissions on May 17, 2024, and having carefully considered the positions advanced in the briefs and at oral argument, the Court will **DENY** Ellison's motions.

## I. BACKGROUND

Based on information received from a confidential informant in July 2022, COMET detectives began surveilling Roy Funches, an associate of Ellison's. Their observations eventually led them to begin investigating Ellison himself. Over the course of a months-long investigation, they obtained three warrants: one authorizing placement of a GPS tracking device on a Dodge Ram truck owned by Ellison, and two more authorizing searches of Ellison's residence on Cedarbrook Court in Farmington Hills.

The first warrant was for the placement of a tracking device on Ellison's truck. In addition to general information about the habits of drug dealers and the affiant's training and experience, the seven-page

warrant application submitted by COMET Detective Scott Burley included the following attestations describing a controlled buy of fentanyl involving both Funches and Ellison:

- In July 2022, a confidential informant who had previously supplied reliable information told COMET detectives that Funches was selling heroin, fentanyl, and cocaine from a residence on Emily Street in Detroit. The informant identified Funches from a driver's license photo. ECF No. 35, PageID.240.

- During the week of October 2, 2022, the informant called Funches to set up the buy. Funches told the informant he needed to contact his supplier. Officers surveilling his home after the call saw a female driver with a male passenger pull up. Funches had a 30-second interaction with the male passenger before the car left. Through the Law Enforcement Information Network (LEIN) and car registration records, detectives identified the driver as Amber Wells. A field test conducted after the informant completed the buy returned positive results for fentanyl. *Id.* at PageID.240-41.

- Believing that Funches called his supplier after speaking with the informant, detectives subpoenaed his phone records. A LEIN check revealed that the number Funches called immediately after speaking with the informant had previously been given to law enforcement by an individual named Onaji Neely. Neely had a 2017 drug conviction. *Id.* at PageID.240-41.

- Detectives obtained a warrant for GPS pings on the phone number. On October 20, 2022, pings placed the phone at Ellison's Cedarbrook Court residence in Farmington Hills. Over the course of the day, officers surveilled Ellison and noted that the phone pings followed him as he travelled in his Dodge truck to the 12 Oaks Mall, returned home, and travelled to Southfield. *Id.* at PageID.241-42.

- Ellison's physical description matched the description of the male passenger who interacted with Funches during the controlled buy. From training and experience Burley knew that it was common for phone numbers used by drug dealers to be passed between members of drug organizations. *Id.* at PageID.240-42.

- A criminal history check showed that Ellison had a 1990 drug conviction. *Id.* at PageID.241.

The search warrant for the tracking device was approved on October 24, 2022.

Some months later, on February 12, 2023, Detective Burley obtained a second warrant, this time to search Ellison's Cedarbrook Court residence in Farmington Hills. His 12-page warrant application repeated the information he had supplied in applying for the GPS tracking warrant, and it provided additional details regarding the progress of the investigation into Ellison after the tracking device was installed on his truck. Broadly speaking, the information Burley supplied fell into three buckets.

*First*, the affidavit provided beefed-up information about Ellison's background obtained from law enforcement databases, state records, and preliminary surveillance of his activities:

- The surveillance of Ellison on October 20, 2022 was more extensive than previously detailed. On that day, while investigating phone pings, officers saw Ellison's car in a lot in Novi. They followed the car back to Ellison's residence, a credit union, and a business. Electronic surveillance showed that, later in the day, Ellison went to a residence in Hamtramck. A LEIN check showed that an individual registered at that address had multiple drug arrests and a 2003 drug conviction. ECF No. 34, PageID.210-11.

- Ellison's criminal history was also more extensive than previously detailed. Law enforcement databases revealed that he had had *two* 1990 state drug convictions, as well as a 2006 federal conviction for conspiring to launder money. *Id.* at PageID.211.

4

- On November 28, 2022, officers received state records showing that Ellison had not paid state taxes from 2019-2021. *Id.* at PageID.213.

*Next*, Burley supplied details concerning the continuing surveillance of Ellison's movements, which included multiple short trips to Funches's house and other meetings consistent with suspected drug activity leading up to the submission of the warrant application:

- On October 25, 2022, electronic surveillance showed that Ellison's vehicle made a short, two-minute stop at a residence in Oak Park. Later in the day, when officers physically surveilled Ellison, they saw him pull into a strip mall in Detroit and briefly interact with an individual who arrived in a different car. That individual got into Ellison's passenger seat and remained about a minute before leaving. A LEIN check showed that his car was registered to an individual who has multiple drug convictions (from 1998, 1999, 2007, 2013, and 2018). *Id.* at PageID.211-12.

- On November 11, 2022, electronic surveillance showed Ellison's vehicle leaving his Cedarbrook Court residence and going to Funches's residence. The informant assisting with the investigation told officers that Funches had called him and said he had cocaine for sale after Ellison left his residence. *Id.* at PageID.213.

- On November 28, 2022, officers observed Ellison leave his home, drive to a residence in Detroit, and park in the driveway. He remained in the driveway while an unknown male from the residence interacted with him through the passenger-side door for about 30 seconds. *Id.* at PageID.213.

- On December 7, 2022, electronic surveillance showed that Ellison's vehicle was parked at a business plaza in Troy from 6:00 p.m. until 11:00 p.m. *Id.* at PageID.213.

- On December 12, 2022, January 2, 2023, and January 13, 2023, electronic surveillance showed that Ellison left his home, went to Funches's residence, and stayed each time for only a few minutes. *Id.* at PageID.213-14.

5

- On January 18, 2023, electronic surveillance showed that Ellison went to an address he frequented on Braile Street in Detroit. During physical surveillance, Burley saw that another male had arrived at the location in a GMC Sierra. A LEIN check showed that the GMC Sierra was registered to an individual who had drug and firearms convictions from the 1990s. *Id.* at PageID.215.

- Also on January 18, 2023, electronic surveillance showed that Ellison and Wells were at the business plaza in Troy from 7:00 p.m. to 11:40 p.m. After leaving the plaza, Ellison's car headed to a CVS, and a surveillance camera recorded a video of Ellison carrying a bag from his car across the parking lot to an unknown car on the far side of the lot. *Id.* at PageID.215.

- On February 7, 2023, officers saw Ellison leave his residence, head to a parking lot around 8 Mile and Dequindre, and pull up alongside an unknown vehicle. Surveillance was briefly interrupted, but officers saw Ellison leave the lot shortly after arriving without visiting any of the businesses around the lot. *Id.* at PageID.215-16.

- On February 12, 2023, Ellison was again observed traveling from his home to Funches's, where he remained for 23 minutes. *Id.* at PageID.216.

*Finally*, Detective Burley included details concerning a series of short trips taken by Amber Wells to and from Chicago, which detectives believed was activity consistent with acting as a "mule," or drug carrier, for Ellison:

- On December 7, 2022, Wells arrived from Illinois at Ellison's residence around 12:42 a.m. Sometime after 1:00 a.m., she drove to the Troy business plaza, and then to a rest stop some 100 miles away in Jackson, Michigan before returning to Ellison's. Burley deemed this activity suspicious because he knew that drug dealers often need to pay transportation fees for the delivery of narcotics. *Id.* at PageID.213.

- On December 16 and December 20, Wells made one-day trips to Chicago from Ellison's residence. On December 29, Wells again

traveled to Chicago and returned on December 31. Burley knew from training and experience that Chicago is a large drug distribution hub in the Midwest. *Id.* at PageID.213-14.

- On January 7, 2023, Wells again made a one-day trip to Chicago from Ellison's residence. On January 11, 2023, when she was driving to Illinois again, Michigan State Police stopped her car, and she consented to a search of her vehicle. A police dog was brought to the scene and alerted to the presence of narcotics in the rear seat. Officers found no drugs, but Wells became agitated. *Id.* at PageID.214. She proceeded to Illinois and returned to Ellison's residence on January 16. *Id.* at PageID.214

- On January 20, 2023, Wells made another one-day trip to Chicago from Ellison's residence. *Id.* at PageID.215.

- On January 27, 2023, electronic surveillance showed Wells traveling to Chicago from Ellison's residence again. Shortly after she left, Ellison made a short trip to Funches's residence. *Id.*

The warrant Burley obtained authorized a search for drug ledgers, other records, drug proceeds, and any firearms used to protect drugs. The description of "things to be seized" included:

> All records, receipts, ledgers, accounts, telephone records, and paraphernalia, suspected of being connected to the illegal trafficking of controlled substances[;] All currency and/or negotiable instruments suspected of being connected to the illegal trafficking of controlled substances[;] All records, bills, photographs, videotapes, computers, suspected of being connected to the illegal trafficking of controlled substances[;] All records, bills, photographs, videotapes, that establish occupancy and/or residency[;] All weapons commonly used to protect controlled substances and/or drug proceeds[;] Any or all property suspected of being purchased with narcotics proceeds.

ECF No. 34, PageID.206.

7

Officers executed the warrant on February 13, 2023. After discovering suspicious tablets on a table in Ellison's home, Detective Burley—apparently believing he needed additional authorization to continue his search—obtained a second warrant for Ellison's residence. His 6-page application for this warrant included a single attestation that, "[d]uring the course of the search for evidence [pursuant to the first residential warrant] sitting in an upstairs bedroom were suspected MDMA tablets sitting on a table. The suspected MDMA tables were … field tested with positive results." ECF No. 33, PageID.175. This warrant authorized a search for and seizure of:

> All substances suspected of being in violation of the Michigan Public Health Code, specifically, but not limited to cocaine. All currency and/or negotiable instruments suspected of being in connection to the illegal trafficking of controlled substances. All records, receipts, ledgers, accounts, telephone records, contraband, and paraphernalia, suspected of being connected to the illegal trafficking of controlled substances. All records, bills, photographs, video tapes, establishing occupancy and/or residency. All weapons commonly used to protect controlled substances and/or drug proceeds. Any or all property suspected to be purchased with drug proceeds. All safety deposit box keys and safes. Any and all electronic and or digital communication devices including but not limited to cellular telephones and or other means of electronic or digital communication and all associated hardware, software and manuals and the contents of any such devices.

ECF No. 33, PageID.171.

The lion's share of the physical evidence against Ellison was seized after detectives continued their search of his residence following the

issuance of the second warrant, and a grand jury later returned an indictment charging him with possessing fentanyl with intent to distribute, 21 U.S.C. § 841(a)(1), possessing cocaine with intent to distribute, *id.* § 841(a)(1), possessing a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A), possessing a firearm as a felon, *id.* § 922(g)(1), and maintaining a drug premises, 21 U.S.C. § 856(a)(1).

Ellison now seeks dismissal of the § 922(g)(1) charge. ECF No. 36. He has also filed motions to suppress, challenging the adequacy of the three warrants described above. ECF Nos. 33, 34, & 35.

## II.    MOTION TO DISMISS (ECF No. 36)

Ellison argues that the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), mandates dismissal of the felon-in-possession charge because the analytical framework it announces renders the felon-in-possession statute, 18 U.S.C. § 922(g)(1), unconstitutional under the Second Amendment.

### A. Legal Standard

A defendant may seek dismissal of a defective indictment in a pre-trial motion under Federal Rule of Criminal Procedure 12(b)(3)(B).

### B. Discussion

The Second Amendment provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." It is an unusual amendment in that, unlike the other amendments in the Bill of Rights, it contains a

prefatory clause explaining the justification for its enactment and qualifying the nature of the right. For the first two centuries following its passage, there was relatively little debate over interpretation of this clause. Broadly, it was understood to concern the maintenance and preservation of a militia for the common defense of the people. *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 178-79 (1939) (concluding that the Second Amendment did not protect the right of an individual to possess a "shotgun having a barrel of less than eighteen inches in length" because there was no evidence that such a weapon "could contribute to the common defense").

But in the last few decades, a movement has emerged, insisting that the purpose of the Second Amendment is broader and has a more personal dimension—in particular, that it establishes a right of every American to bear arms in defense of *self*. And in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court for the first time re-interpreted the Second Amendment to find the existence of such a right. After reviewing Founding Era history, Justice Scalia's majority opinion held that a complete prohibition on handguns in the home enacted in the District of Columbia "fail[ed] constitutional muster" because it violated "the inherent right of self-defense [that] has been central to the Second Amendment right"—in particular, because in the home, "the need for defense of self, family, and property is most acute." *Id.* at 628-29.

In announcing the existence of this unenumerated but apparently "inherent" right of law-abiding American citizens to possess firearms for defense of self and property, the Supreme Court nonetheless cautioned that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. Justice Scalia expressly noted that nothing in the majority's opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"—which, he explained in a footnote, were "presumptively lawful." *Id.* at 626-27 & n.26. And in a later decision invalidating a municipal gun ordinance in Chicago, the Supreme Court again "repeat[ed] … assurances" that laws prohibiting felons from possessing firearms remained presumptively valid. *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).

In the aftermath of *Heller*, federal Courts of Appeals adopted a "two-step" framework to evaluate challenges to laws and regulations restricting the possession of firearms. At the first step, the government could argue that the challenged regulation applied to activity falling outside the scope of the Second Amendment right as it was originally understood. If the government could establish that the regulated conduct was beyond the scope of the Second Amendment, the analysis stopped there. But if the challenge proceeded to the second step, courts would apply a sort of "means-end" scrutiny, analyzing how close the means adopted by the regulation came to the core of the Second Amendment

11

right and how severely its ends burdened that right. *Bruen*, 597 U.S. at 18-19 (collecting cases).

In *Bruen*, however, the Supreme Court determined that this two-step framework was inconsistent with *Heller*. According to Justice Thomas, who wrote the majority opinion, the second step was "one step too many." *Id.* at 19. While step one was "broadly consistent with *Heller*, which demand[ed] a test rooted in the Second Amendment's text[] as informed by history," *Heller* did not support applying the "means-end" scrutiny courts were applying at step two. *Id.* Justice Thomas revised the two-step test to be applied as follows: *first*, a court must evaluate whether the government can rebut the presumption that the Second Amendment protects the challenged gun-possession conduct; *second*, the court must evaluate whether the government can justify a challenged regulation by demonstrating that it is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

Ellison's *Bruen* argument is relatively short. He argues that felons like himself are part of the "People" protected by the Constitution, so their conduct in possessing firearms falls within the scope of the Second Amendment. From there, he asserts that the government will not be able to meet its burden to show that § 922(g)(1) has a historical analog—so the statute must be declared unconstitutional. His challenge is a facial one; it seeks a declaration that the statute is "utterly inoperative," rather

12

than a declaration that it is unconstitutional only as applied to him. *See United States v. Frost*, 125 F.3d 346, 370 (6th Cir. 1997).

This District has been almost unanimous in rejecting the type of challenge Ellison raises. Indeed, as Ellison acknowledged during oral argument, this Court itself has twice rejected *Bruen* challenges in reasoned opinions. *See United States v. Nelson*, 680 F. Supp. 3d 827 (E.D. Mich. 2023); *United States v. McNeil*, No. 23-20229, 2023 WL 6627972 (E.D. Mich. Oct. 11, 2023). The reasoning of this Court and other courts in the District is that, despite unsettling the analytical framework of several Courts of Appeals, nothing in *Bruen* purported to overrule *Heller* or disturbed Justice Scalia's observations in the majority opinion that regulations prohibiting felons from possessing firearms were *presumptively lawful*—and that, at any rate, district courts in the Sixth Circuit are bound by the Sixth Circuit's decision in *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010), which upheld the constitutionality of § 922(g)(1) without applying the sort of means-end scrutiny condemned by Justice Thomas in *Bruen*.

Ellison does not offer a response to this wrinkle in his argument. Of course, as the government acknowledges, since this Court last addressed a *Bruen*-related argument, one court in this District has found § 922(g)(1) unconstitutional as applied to a particular defendant. In *United States v. Williams*, No. 23-20201, __ F. Supp. 3d __, 2024 WL 731932 (E.D. Mich. Feb. 22, 2024), the Honorable Judith E. Levy held that § 922(g)(1)

13

regulated conduct protected by the Second Amendment and that the government had failed to establish the statute had an appropriate historical analog. Despite the weight of case law in the District to the contrary and without an extended explanation, Judge Levy reasoned that the defendant's *Bruen*-related arguments could not be resolved under the existing Sixth Circuit guidance in *Carey* because *Carey* pre-dated *Bruen*. From there, she examined the historical regulations raised by the government in defense of § 922(g)(1) and concluded that none of them were on point.

Judge Levy's opinion in *Williams* is not binding on this Court, however. *Carey* is. And the panel in *Carey* relied on Justice Scalia's admonition in *Heller* that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" in upholding the constitutionality of the federal felon-in-possession statute. 602 F.3d at 741. Of course, other panels of the Sixth Circuit have acknowledged that this admonition in *Heller* is dicta. *See, e.g.*, *United States v. Khami*, 362 F. App'x 501, 507 (6th Cir. 2010). But they recognize that district courts and Courts of Appeals "are obligated to follow Supreme Court dicta, particularly when there is no substantial reason for disregarding it, such as age or subsequent statements undermining its rationale." *Id.* (quoting *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002)). And they have applied it. *Id.*

14

This Court can find no authority requiring that it disregard *Heller*'s admonition.

*First,* the Sixth Circuit has previously reasoned that the admonition "carries significant weight" in addressing a similar attack to the constitutionality of § 922(g)(1) in the aftermath of the decision, *see id.*, and *Heller* is not even two decades old.

*Second*, Justice Thomas's majority opinion in *Bruen* expressly noted that he viewed its holding as "in keeping with *Heller*." 597 U.S. at 17. The Justices that both concurred and dissented with his opinion stated that they did not understand *Bruen* to disturb "longstanding prohibitions on the possession of firearms by felons." *Id.* at 81 (Kavanaugh, J., concurring) (quotations omitted); *see also id.* at 72 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 129 (Breyer, J., dissenting) (understanding the majority opinion to cast no doubt on the aspect of *Heller* prohibiting firearms possession by felons and the mentally ill).

*Finally,* in the Supreme Court's most recent application of *Bruen*, a decision that upheld the constitutionality of § 922(g)(8)'s prohibition of persons subject to restraining orders from possessing guns, the Court again restated *Heller*'s pronouncement that prohibions "on the possession of firearms by felons and the mentally ill[] are presumptively

lawful." *United States v. Rahimi*, No. 22-915, __ S. Ct. __, 2024 WL 3074728, at *10 (June 21, 2024) (internal quotations omitted). Indeed, in rejecting the argument that § 922(g)(8) was unconstitutional because it invaded the defendant's right to bear arms in defense of himself in the home, the majority opinion authored by Chief Justice Roberts further reiterated that "*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearms in the home." *Id.* If the Supreme Court wished to cast doubt on the weight lower courts should give to *Heller*'s pronouncement that prohibitions of firearms by felons were consistent with the Second Amendment, it should not have repeated it for the third time in a majority opinion. Although the Supreme Court has yet to squarely address the specific question of whether and how § 922(g)(1)'s federal ban on felons possessing firearms is consistent with the Second Amendment under the newly adopted *Bruen* framework, its previous statements are sufficient to urge this Court to exercise caution before attempting to blaze an uncharted trail in order to find the statute unconstitutional. The Supreme Court, or the Sixth Circuit, will have to do that.

Accordingly, Ellison's motion to dismiss is **DENIED**.

### III.   MOTIONS TO SUPPRESS (ECF Nos. 33, 34, & 35)

The Court next considers Ellison's motions to suppress evidence. It will discuss his challenges to the warrants in the order they were issued. Ellison requests a *Franks* hearing in relation to all of them.

### A. Legal Standards

Federal constitutional law applies to state warrants challenged in federal court. *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022). The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To establish probable cause, officers must establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Put another way, there must be a "nexus" between the "place" to be searched and the "things" to be seized. *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021).

In assessing the sufficiency of an affidavit supporting a warrant, the Court looks only to the four corners of the warrant; information known to an officer but not conveyed to the warrant-issuing judge is irrelevant. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010). To encourage use of the warrant procedure, a magistrate judge's probable-cause determination is afforded "great deference" and should be reversed only if the issuing judge arbitrarily exercised his discretion. *Gates*, 462 U.S. at 236 (internal quotations omitted); *see also United States v. Baker*, 976 F.3d 636, 646 (6th Cir. 2020) (recognizing courts' obligations to give issuing judges the benefit of the doubt in "doubtful or marginal cases").

The weight to be given to an informant's report depends on the informant's reliability and basis of knowledge; a tip that has independent substantial corroboration or comes from a known source carries more weight than an uncorroborated anonymous tip. *Gates*, 462 U.S. at 230-34; *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009). "Anonymous tips … demand more stringent scrutiny of their veracity, reliability, and basis of knowledge than reports from confidential informants." *United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003). Drug paraphernalia recovered from a trash pull, in combination with other evidence of drug-trafficking activity, may be used to establish probable cause to search a home. *United States v. Abernathy*, 843 F.3d 243, 251-52 (6th Cir. 2016).

### B. Franks *Hearing*

The Court will begin with Ellison's request for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Ellison asserts that such a hearing is required because each of the three warrants Detective Burley obtained during the investigation into him contained material falsehoods and omissions.

Affidavits supporting warrant applications generally are entitled to a "presumption of validity." *Franks*, 438 U.S. at 171. A defendant can overcome that presumption and impeach the contents of an affidavit at a hearing if he makes "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations [are] accompanied by an offer of proof." *Id.* at 171-72. But proving an entitlement to a *Franks*

hearing is no easy task: A defendant must make a "substantial preliminary showing" that a law enforcement affiant included a false statement intentionally, knowingly, or with reckless disregard for the truth—and that, without the statement, the remnants of the affidavit could not support a finding of probable cause. *Id.* at 155-56; *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).

Ellison begins his attack on Burley's truthfulness by highlighting a purported "inconsistency" between the information in the applications for the warrants for the GPS tracking device and the first search of his home, on the one hand, and the application for the GPS phone ping warrant, on the other. Ellison does not challenge the ping warrant—he merely points to statements in the application for the ping warrant that differ from those in the applications for the subsequent warrants. ECF No. 35, PageID.225-26.

Recall that, before officers applied for the warrants that Ellison now challenges, they obtained a warrant to track GPS phone pings of the phone number that Roy Funches called during the October 2022 controlled buy with the informant. Given the timing of the call, plus information from the informant that Funches had told him he did not have the requested quantity of fentanyl on hand and needed to contact his supplier, officers suspected that the number Funches called belonged to his supplier. Through law enforcement databases, they learned that the number had previously been given to police officers by a man named

19

Onaji Neely during an unrelated investigation. Before the controlled buy was completed, officers on surveillance saw Wells briefly drive up to Funches's house with an unknown black male passenger who had a 30-second interaction with Funches in the driveway. They believed this passenger was his supplier. In the application for the GPS ping warrant, based on information then available to him, Burley wrote that Neely's physical description matched the description of the unknown male with whom Funches interacted in the driveway. *Id.* at PageID.233.

Ellison points out a contradiction between this statement in the application for the GPS ping warrant and what Burley wrote when he applied for the GPS tracking warrant—*i.e.*, that in the GPS tracking Burley wrote that Wells's passenger matched *Ellison's* physical description. According to Ellison, this inconsistency in the attestations regarding the identity of the black male with whom Funches interacted is "inexcusable." *Id.* at PageID.226. He asserts that, at the very least, Burley was required to explain the inconsistency.

But this inconsistency is of no import. Instead, it is wholly consistent with the reality that—in the five-day period between when Detective Burley obtained the cell location ping warrant and the GPS tracking warrant—he developed additional information that enabled him to draw a more accurate conclusion about the identity of the unknown male passenger in Wells's car. Specifically, COMET detectives tracked the GPS pings to Ellison's residence, and they also observed the phone

20

appear to be moving in step with Ellison's truck as he traveled to several different locations—including a mall, his home, and some other locations. It appears that they learned his identity from car registration records. The inconsistency is the product of an incorrect assumption that was later corrected through additional investigation—*i.e.*, nothing more than an innocent mistake. And "[a]llegations of negligence or innocent mistake[s] are insufficient" to warrant a *Franks* hearing. *Franks*, 438 U.S. at 171. What's more, it is not clear that the two statements are necessarily in conflict. Though the record is silent on the question, it is conceivable that Neely's physical description is similar to Ellison's.

Ellison points to four other "falsehoods" in an effort to establish the preliminary falsity showing for a *Franks* hearing.

*First*, he directs the Court's attention to paragraph S from the first residential search warrant, which concerns the traffic stop of Wells conducted by the Michigan State Police. In full, this paragraph reads:

> On January 7, 2023, WELLS is observed leaving the area of Chicago Illinois at approximately 10:00 p.m. Eastern Standard Time (EST) and traveling to the State of Michigan. WELLS was observed via physical surveillance arriving at ELLISON's residence … at approximately 1:30am EST on a January 8, 2023. On January 11, 2023, WELLS is observed via electronic surveillance leaving ELLISON's residence and returning to ILLINOIS. MSP Troopers affected a traffic stop of WELLS vehicle around Jackson Michigan WELLS consented to a search of the vehicle at this time. Roseville Police K9 Officer Dobrzycki and K9 Chase conducted a sniff of the vehicle for narcotics. The K9 alerted to the presence of narcotics in the rear seat of the vehicle. A cursory check of the

vehicle was unable to locate narcotics in plain view. WELLS became highly agitated when the K9 Officer arrived at the scene. Your Affiant knows through training and prior police experience that couriers of narcotics and narcotics proceeds will often utilize vehicles that have concealed compartments in an effort to evade detection from law enforcement of their illegal activity.

ECF No. 34, PageID.214. According to Ellison, the paragraph materially misrepresents what actually happened during the traffic stop—it falsely suggests that officers searched the vehicle only one time, for instance, and that the searches were "cursory." *Id.* at PageID.192-93. He has submitted an affidavit from Wells, in which she swears that officers *thrice* searched her vehicle. She asserts that the searches lasted 5-10 minutes and included officers ripping open a box in the backseat. She continues that no officer ever told her the police dog smelled drugs. She explains that she became upset because officers cut a piece of the floormat from the passenger side of her vehicle. ECF No. 46. The government acknowledges that there are some errors in Burley's description of the encounter: specifically, the date of the stop was January 7, not January 11. The Court concludes that, considered as a whole, Ellison's efforts to show that Burley lied about the circumstances of the stop based on Wells's affidavit are not sufficient to create a strong showing that Burley intentionally lied in the affidavit. The affidavit contains a brief description of the stop that differs, but not materially so, from the version of events provided by Wells. Whether she was upset by the search, or

whether the officers removed a piece of carpeting, or whether they told her of the K-9's positive alert, or whether the length of the search was too long to be considered "cursory"—none of these differences are significant enough to suggest that the officer was intentionally lying or knowingly omitting material facts. The key facts are that the car was stopped and that no drugs or other evidence was found, and Wells's version corroborates those facts. Wells simply details the same events from the perspective of an understandably disgruntled citizen.

*Second*, Ellison says that paragraph AA from the same warrant, which concerns an attempt at physical surveillance of Ellison in a parking lot, contains falsehoods. In full, this paragraph reads:

> On February 7, 2023, your Affiant along with members of COMET conducted physical surveillance of Curtis ELLISON beginning at [his residence] … [a]t approximately 11:00 a.m. At approximately 6:28 p.m. ELLISON left the residence and surveillance was maintained to the area of 8 Mile Rd. and Dequindre where ELLISON pulled into a parking lot between Imperial Supermarket, and Footlocker at approximately 6:55p.m. ELLISON was observed pulling up alongside an unknown vehicle in a parking lot. Surveillance was interrupted for less than a minute and ELLISON left the parking lot. ELLISON left the parking lot at approximately 6:56 p.m. Your affiant knows through training and prior police experience that short stay traffic in parking lots without ever utilizing a business to be consistent with narcotics transactions. Further this is a parking lot that ELLISON has been observed conducting another hand to hand narcotics transaction during the course of this investigation.

ECF No. 34, PageID.216. According to Ellison, any assertion that he conducted any hand-to-hand drug transaction is "misleading and untrue" since surveillance was interrupted. But the Court sees nothing improper about the statement that Burley believed, based on his training, experience, and observations, that he had witnessed activity consistent with a drug sale—even if he could not confirm that belief.

*Third*, Ellison challenges the attestation in paragraph X, which states that he carried a bag across a CVS parking lot to an unknown vehicle. In full, this paragraph reads:

> On January 18, 2023, at approximately 7:00 p.m. ELLISON, and WELLS are observed via electronic surveillance going to 1050 Wilshire Dr. Troy MI. This is the Wilshire Plaza that contains business suites. The pair are at the plaza till approximately 11:40 p.m. on January 18, 2023. After leaving the plaza the ELLISON's Dodge Ram is observed via electronic surveillance going to a CVS and observed pulling into the parking lot via surveillance footage. ELLISON is observed carrying a bag across the camera and getting to an unknown vehicle on the far side of the lot.

Ellison says this is false because he never left his vehicle on that evening as he simply went to CVS to pick up medications for a recent surgery. In an affidavit submitted after the hearing, he swears that he has never seen the footage that supposedly depicts him. He supplies a doctor's note and asserts that Wells drove him to CVS in January after he had undergone a surgical procedure so that he could pick up medications that his doctor had prescribed. ECF No. 46. But even if it is true that Ellison

24

had a legitimate reason for being at CVS late at night, and that Burley mistook an unrelated third party for Ellison in the surveillance video, the behavior Burley described—when considered against everything else Burley had seen and knew up until that point—appeared suspicious. There is no basis to conclude that he knowingly made a false statement.

*Fourth*, Ellison challenges Burley's attestations that a field test on the tablets found in his home returned positive results for the presence of MDMA. He says that the detective who conducted the field test failed to follow instructions on the field-test kit and also failed to follow instructions in interpreting the results of the test. At oral argument, defense counsel insisted that the tablets did not clearly resemble any drugs with which officers are commonly familiar and instead looked more like candies. A photograph of the tablets included in his briefs is replicated below:



Counsel's statement that the pills more closely resembled candy is not plausible. The photograph speaks for itself: The individually- and suspiciously-wrapped, brightly colored tablets appear more like drugs packaged for street sale than candy. Their unusual appearance is enough

for a prudent officer to want to investigate further. And they were discovered in the home of a suspected large-scale drug dealer. Officers then attempted to verify their suspicions that the tablets were drugs by conducting a field test. Whether detectives did or did not follow the instructions on the field test kit is immaterial under these circumstances.

Ellison says that, beyond this, there are other issues with the warrants. But he does not discuss specifics. And the "well-settled framework for *Franks* hearings requires a defendant to point to *specific* false statements" and then "accompany his allegations with an offer of proof." *United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (emphasis in original, quotations omitted).

On the whole, Ellison has failed to establish any material inaccuracy in the warrant applications that could support a strong showing of reckless disregard for the truth or deliberate falsehoods. Some of Detective Burley's written statements may have been hastily drafted; there are typographical and grammatical errors that should have been caught and corrected. But this is entirely consistent with the reality that warrant applications are generally drafted by non-lawyers in the rushed atmosphere of active investigations. And, more critically, even if the Court were to agree with Ellison that any of the attestations he points to were false, he cannot persuade the Court that they were material to the warrant-issuing judge's ultimate determination of probable cause. Accordingly, Ellison's request for a *Franks* hearing must be **DENIED**.

### C. GPS Tracking Device Warrant

The Court turns next to Ellison's challenges to the adequacy of the warrant application for the GPS tracking device on his truck.

The use of a tracking device to monitor a vehicle's movement is considered a search under the Fourth Amendment and therefore must be authorized by a warrant. *United States v. Jones*, 565 U.S. 400, 404 (2012). A warrant for such a device may be issued "if a supporting affidavit establishes probable cause to believe that the device will uncover evidence, fruits, or instrumentalities of a crime." *United States v. Coleman*, 923 F.3d 450, 454 (6th Cir. 2019). The inquiry is not whether probable cause exists to believe that evidence of a crime will be found *in* the vehicle, but rather whether there is a fair probability that information gathered from the tracking device will reveal evidence of criminal behavior. *United States v. Petitfrere*, No. 22-00037, 2022 WL 2134590, at *4 (E.D. Ky. June 14, 2022); *United States v. Harden*, No. 20-20280, 2021 WL 5506439, at *3 (E.D. Mich. Nov. 24, 2021).

According to Ellison, the affidavit for the tracking device is completely "barebones." ECF No. 35, PageID.224-25. He asserts that, when Detective Burley applied for the warrant, he had scant evidence of Ellison's involvement in drug-trafficking and *no* evidence that the Dodge Ram was being used for criminal purposes. He also attacks the inclusion of his decades-old drug conviction from 1990 in the affidavit, asserting that it is a "telling sign of the lack of probable cause." He suggests that

27

the affidavit contains information about another individual with whom
Ellison interacted in Hamtramck that had more recent convictions and
would have been a more suitable target for a GPS tracking device.

Ellison may be correct in pointing out that a person's decades-old
conviction carries little weight in permitting an inference of current
involvement in drug trafficking. But that fact was only one of several
pieces of information that Burley supplied in his affidavit.

The other attestations supporting the warrant application can be
distilled down to the following:

- An informant told detectives that Roy Funches was selling large
  quantities of drugs out of his house.

- In early October 2022, the informant participated in a controlled
  purchase of narcotics from Funches. When Funches told the
  informant that he needed to contact his supplier to complete the
  sale, officers began surveilling his house and saw a car pull up.
  Funches had a 30-second interaction with its unknown male
  passenger before the car left. Funches then called the informant to
  complete the sale.

- Detectives subpoenaed phone records for Funches's phone that
  showed the number Funches called immediately after speaking
  with the informant. A LEIN check revealed that the number
  Funches called had been previously given to law enforcement by an
  individual named Onaji Neely during an unrelated investigation.

- Detectives obtained a warrant for GPS phone pings on the number
  that Funches had called just after speaking with the informant. On
  October 20, 2022, pings placed that phone at Ellison's residence.
  Over the course of the day, officers surveilled Ellison and observed
  that the GPS phone pings followed him as he travelled in his truck
  to a mall, returned home, and then travelled to Southfield. From
  these observations, they concluded that Ellison was carrying the

phone that Funches had called on the day of the controlled buy, just after speaking with the informant. From this, they concluded that Ellison was probably the male who interacted with Funches during the controlled buy.

So, when Burley applied for the warrant, officers knew that: (1) Funches was a drug dealer; (2) a man who looked like Ellison had an interaction that looked like a drug sale in Funches's driveway during a controlled buy; and (3) Ellison traveled in the truck with the phone that Funches called during the controlled buy.

In *United States v. Coleman*, the Sixth Circuit upheld the issuance of a tracking-device warrant based on the following attestations:

- A confidential source had identified the defendant as a drug supplier;

- Law enforcement had investigated prior drug sales, one of which involved the defendant dropping off drugs;

- An investigator had seen the defendant drive to a residence and conduct what he believed was a short-stay drug sale;

- The defendant had prior convictions for drug offense; and

- A LEIN check on the vehicle identified the defendant as the vehicle's owner.

923 F.3d at 454. *Coleman* observed that other courts have upheld tracking-device warrants based on weaker facts. The observations here, if not the same in quantity, are equal or better in quality: Detectives witnessed an encounter where they believed Ellison was supplying a known drug dealer during a controlled buy, they confirmed that Ellison owned the vehicle that was the subject of the tracking-device warrant,

and they confirmed that he was traveling extensively with the phone that was suspected to be a drug-supplier phone.

Of course, the existence of probable cause would have been strengthened if Ellison was implicated in additional controlled buys—or if officers saw Ellison participating in suspicious transactions using his car. But the information supplied to the issuing judge establishes a reasonable probability that further evidence of criminal behavior would be found by placing the GPS device on the truck. That is all that is required. Even assuming for the sake of argument that it failed to do so, the good-faith exception would save the search: No reasonable officer would know to second-guess the issuing judge's decision under these circumstances. *See generally United States v. Leon*, 468 U.S. 897 (1984).

Accordingly, Ellison's motion to suppress evidence from the GPS tracking device must be **DENIED.**

### D. First Cedarbrook Court Warrant

The Court now considers Ellison's challenges to the adequacy of the first warrant authorizing a search of his residence.

"Probable cause exists to search a residence if an affidavit directly connects the residence with the suspected drug dealing activity." *United States v. Sheckles*, 996 F.3d 330, 341 (6th Cir. 2021) (quotations and alterations omitted). In the case of known or suspected drug dealers, a defendant's status as a drug dealer generally must be combined with

some other evidence that he was engaged in "continual and ongoing operations" to justify a search of his residence. *Id.* (quotations omitted).

Ellison offers several challenges to the adequacy of the attestations supporting the first warrant for the search of his Cedarbrook home.

*First,* he attacks the nexus between his home and any suspected narcotics activity. He argues that Burley's affidavit is nothing more than "a massive jumble of irrelevant allegations that lack even the basic level of potential crime." ECF No. 34, PageID.188. He notes that officers never saw him with narcotics. He continues that, although there are repeated claims of short-stay drug sales, the affidavit never expressly says that he was seen exchanging anything with anybody—or that he was involved in suspected drug sales at or near his home. *Id.* at PageID.188-90.

*Second*, Ellison contends that any information about Wells's involvement in any crime is irrelevant and baseless. *Id.* at PageID.188. He characterizes the inclusion of this information as "bloat[ing]" the affidavit with "speculative allegations in the hope that the warrant sounds more convincing." *Id.* He spotlights that, when Wells was stopped on January 7, 2023 on her way from Ellison's home to Chicago, Burley apparently believed that she was acting as a mule for Ellison. *Id.* His counsel urges that, when detectives could not immediately find drugs in her car, they "let Ms. Wells continue on her drive???? It is implied that the officers did not have probable cause to take the search to the next level, yet claim that this event is probable cause!!!" *Id.* His counsel

further suggests that, because the officers found no evidence when they stopped Wells, the facts pertaining to her frequent trips back and forth to Chicago do not add anything to the probable cause determination.

*Third*, Ellison charges that Burley's attestations about his suspected involvement in drug trafficking were stale. *Id.* at PageID.190. He insists that, outside of observations by detectives that he may have interacted with Funches during the October 2022 controlled buy, officers had no evidence that he was involved in narcotics trafficking outside of sheer speculation. *Id.* And, he argues, the traffic stop of Wells in January 2023 further diluted any arguably existence of probable cause because officers were unable to find any drugs in the vehicle. *Id.*

Ellison's challenges hit on a common point of the nexus requirement as it applies to drug distribution cases. The Sixth Circuit has "struggled to identify the quantum of evidence needed to connect drug trafficking by an individual to a probability that evidence will be found in the individual's residence." *United States v. Reed*, 993 F.3d 441, 448 (6th Cir. 2021) (quotations omitted). On one hand, it has observed that "evidence is likely to be found where the dealers live." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (quotations omitted). On the other, it has rejected "the proposition that a defendant's status as a drug dealer, standing along, gives rise to a fair probability that drugs will be found in his home." *United States v. James*, No. 22-3714, 2023 WL 4536086, at *3 (6th Cir. July 13, 2023) (quotations omitted). At the same

time, the Court of Appeals acknowledges that "[e]vidence of a defendant's ongoing course of unlawful conduct may make it reasonable to conclude that he keeps evidence of his illegal scheme in his home." *United States v. McCoy*, 905 F.3d 409, 417 (6th Cir. 2018).

Yet the issue is not murky when there is a clear connection between the drug dealing activity and the residence to be searched. *United States v. Ward*, No. 22-1133, 2023 WL 370911, at *3 (6th Cir. Jan. 24, 2023). And here, there is a direct a connection between Ellison's home and his suspected drug-trafficking activity. Ellison's arguments to the contrary hinge on viewing each of Burley's attestations in isolation. It is true that his criminal history was somewhat stale. It is also true that the only time officers were able to confirm the presence of narcotics in any of the suspected drug sales was in October 2022 during the controlled buy at Funches's residence—*after* Ellison had already left. The Court also acknowledges that detectives never conducted trash pulls at the Cedarbrook Court residence, and their attestations about *seeing* him actually exchange anything with anyone are quite sparse.

Nonetheless, there is no requirement that detectives conduct an investigation in any particular way, and the months-long investigation conducted in this case was thorough, detailed, and repeatedly returned to the Cedarbrook Court residence. The Sixth Circuit has held that a sufficient nexus is established when a residential search warrant includes facts that the defendant traveled directly from the residence to

be searched to the site of a drug sale. *See, e.g.*, *United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008). Here, after first encountering Ellison at the scene of a controlled buy, officers confirmed that Ellison traveled to and from his home with a suspected drug-supplier phone. They then observed him travel directly from his home to *multiple* suspected drug transactions and interact with many individuals who had prior drug-related convictions. In particular, they saw him repeatedly visit the home of Funches, a known drug dealer, over the course of several months and stay for mere minutes. They also saw him participate in other suspicious encounters—in driveways, for instance, and in the parking lots of businesses that he never patronized.

Of course, outside of the controlled buy, officers were never able to confirm the presence of narcotics. But they were entitled to rely on their training and experiences in drawing conclusions from observations such as the ones detailed in this case. *United States v. Branch*, 537 F.3d 582, 589 (6th Cir. 2008). These observations were extensive, and based on their training and experience, officers concluded that Ellison's trips to and from his home were consistent with drug-trafficking behavior—*i.e.*, re-supplies, short-stay sales, and hand-to-hand sales. This was more than sufficient to show a connection between the search location and Ellison's suspected drug activity. *Gunter*, 266 App'x at 419 ("[T]his Court's precedents establish that a nexus exists between a known drug

dealer's criminal activity and the dealer's evidence when some reliable evidence exists connecting the criminal activity with the residence.").

To the extent that Ellison argues no inferences can be drawn from the observations of Wells's behavior, the Court is unpersuaded. Bear in mind that it was Wells who drove Ellison to Funches's house on the day of the first undercover buy. She also engaged in quite suspicious behavior when, on December 7, 2022, she returned arrived from Illinois to Ellison's residence around 12:42 a.m., then left there at 1:00 a.m. to drive to the Troy business plaza, and thereafter drove nearly another 100 miles away to a rest stop in Jackson, Michigan, only to return to Ellison's. ECF No. 34, PageID.213. Burley understandably deemed this activity suspicious. Wells appeared to be living with Ellison at the Cedarbrook residence while engaging in conduct that led officers to believe that she was acting as a mule—either for drugs, or for drug proceeds. What happened during the January 7, 2023 traffic stop is at best inconclusive. It neither required officers to disregard their prior observations of her nor what they later learned about her behavior. And in any event, the attestations in the Burley's affidavit are strong enough to establish probable cause even if all references to Wells's travel to and from Chicago are excised.

Meanwhile, the argument that the information in the warrant was stale is completely without merit. Officers persisted in a months-long course of consistent surveillance of Ellison, leading up until the decision to apply for the warrant on February 12, 2023. The most recent

observation included in the affidavit describes Ellison again going to Funches's home and remaining for only a short period on the very day that Burley submitted his warrant application. There are not any significant surveillance gaps preceding this. Instead, officers steadily amassed more and more information about Ellison's activities.

Despite the focus of the investigation being on drug trafficking, Burley chose to limit the scope of the warrant to instrumentalities and proceeds of drug trafficking—currency, records, and guns in the initial warrant—as opposed to seeking authority to look for drugs more broadly. That is a decision left to his professional discretion. The critical question posed by this decision is whether Burley supplied the warrant-issuing judge with enough information to conclude that there was a reasonable probability that currency, guns, and records of drug-dealing activity would be stored at the residence. To this end, the attestations of Burley's affidavit taken as a whole, and particularly those recounting how Ellison repeatedly went directly from his home to interact with known drug dealers and engaged in short-stay meetings consistent with drug deals, plus observations that Wells often returned to Ellison's from suspicious one-day trips to Chicago, were sufficient to make out probable cause that the instrumentalities and proceeds of drug trafficking would be likely to be found in his residence.

Assuming for the sake of argument that—in combination—the attestations in the warrant application still were not sufficient to yield

probable cause, there is no meritorious argument that the good faith exception does not save the results of the search. The affidavit is several pages long and includes no "fluff." It describes multiple observations of Ellison engaged in suspicious behavior made over the course of several months. No reasonable officer would second-guess the issuing judge's decision to authorize the search.

Accordingly, Ellison's motion to suppress evidence seized during the first search of his residence is **DENIED.**

### E. Second Cedarbrook Court Warrant

Finally, the Court must consider Ellison's challenge to the second warrant for Ellison's residence. The thrust of this challenge is that the officer who conducted the field test after the suspected MDMA tablets were discovered did not follow instructions on the field test kit. Specifically, Ellison argues that "it does not appear that officers followed the company directions by doing a second confirming test" after the field test kit returned positive results. And, he continues, Burley did not include any information in the affidavit indicating the quantity of tablets recovered—so the issuing judge would have no way of knowing whether the tablets were of a personal-use or distribution-type quantity.

This argument is unconvincing. Even in the absence of a field test (or a botched field test), the officers' discovery in plain view of what appeared to be illegal narcotics during a search warrant execution for evidence related to drug trafficking gave them probable cause to believe

37

that other drugs likely would be found. The second warrant would have been sufficient even if there had been no field test of the drugs.

Indeed, considering the lengthy investigation that preceded Burley's application for this warrant, this second warrant seems almost unnecessary. And given the Court's conclusions regarding the sufficiency of the first residential search warrant, it is immune to challenge. The probable cause established by the first residential search warrant was sufficient to authorize a full search of Ellison's residence. Of course, that warrant expressly authorized a search only for records of drug-dealing activity, drug proceeds, and guns. But that warrant authorized officers to search all the same rooms and cabinets where they presumably could have discovered evidence of actual drugs (though perhaps not the use of the police dog they brought to the home after obtaining the second warrant). Burley's application for the second residential search warrant only strengthens the existence of probable cause by adding that, during the execution of the first residential search warrant, detectives discovered suspected narcotics in plain view on a bedroom table.

There also is no meritorious argument that the good-faith exception would not apply if the warrant failed to establish the existence of probable cause. The same judge, the Honorable Alyia Hakim, issued all three warrants being challenged in this case, including the first residential search warrant on the day preceding the application for the second one. *See United States v. Thomas*, 852 F. App'x 189, 198 (6th Cir.

38

2021) (recognizing that, in evaluating whether an officer acted in good faith, a court may sometimes consider facts outside the four corners of an affidavit, including whether the same judge issued multiple warrants relating to the same investigation).

Like Ellison's other motions to suppress, the motion to suppress evidence seized during the second search of his home must be **DENIED**.

## IV.   CONCLUSION

For the reasons above, the motion to dismiss the felon-in-possession charge is **DENIED.** The motions to suppress, along with the request for a *Franks* hearing, are also **DENIED**.

The Court sets this matter for trial to commence on  September 24, 2024 at 9:00 a.m.. [1]

**SO ORDERED** this 2nd day of July, 2024.

---

[1] More than 30 days have elapsed between when this matter was fully briefed, on May 17, 2024, and today's decision. Although neither party has raised any concerns regarding the Speedy Trial Act, that statute provides pursuant to 18 U.S.C. § 3161(h)(1)(D), that 30 days are excludable for the Court's consideration of a motion after a hearing. After that, for the period between June 17, 2024 until the new trial date set out in this Order, the Court finds that the ends of justice outweigh Ellison and the public's interest in a speedy trial due to the complexity of the legal issues raised in the motions. 18 U.S.C. § 3161(h)(7)(A). The necessity of spending sufficient time thoroughly evaluating these issues and reaching a correct legal conclusion clearly served the interests of justice. 18 U.S.C. § 3161(h)(7)(B)(i)-(iv). Accordingly, the period between June 17, 2024 and the new trial date constitutes excludable delay.

BY THE COURT:


/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge